# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| LYNDON VETERINARY CLINIC, PLLC, on behalf of itself and all others similarly situated, | Case No. |
| Plaintiff, | CLASS ACTION |
| v. | COMPLAINT |
| STERICYCLE, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

Plaintiff, LYNDON VETERINARY CLINIC, PLLC ("Plaintiff"),

individually and on behalf of a class of all those similarly situated, upon personal

knowledge as to facts pertaining to itself and upon information and belief as to all

other matters, based on the investigation of its counsel, against Defendant

STERICYCLE, INC. ("Stericycle" or "Defendant"), states as follows:

## I.     NATURE OF ACTION

1.      This consumer class action arises from Stericycle's breach of its

standard form contract with medical clinics, veterinary clinics, medical labs,

municipal jails, and others across the country that hired Stericycle to dispose of

their regulated medical waste.  Stericycle, a publicly traded medical waste disposal

company with $1.9 billion in revenues in 2012, generates this extraordinary

revenue by programming its internal billing and accounting software to

automatically charge an 18% annual price increase in the flat rates it charges its

customers.  This "automated price increase," to use Stericycle executives'

corporate-speak, has never been disclosed to the customers who paid it, and it is

not permitted by the customers' contracts with Defendant.

2.      Stericycle uses an internal electronic billing and accounting software

system called Tower.  Stericycle executives directed that the Tower system's

programming default to an 18% "automated price increase" for "small-quantity,"

non-institutional customers.  In 2012, these customers made up 97% of Stericycle's

- 1 -

541,000 customers worldwide. This price increase appeared without notice or explanation on customers' invoices annually, and sometimes as often as every nine months.

3.     Stericycle's executives knew the automated price increases were wrong, because in 2006 they were urged by their own Vice President to deprogram the Tower system in order to cease the practice with respect to federal governmental customers when several federal customers got wind of it. But they continued the practice with regard to the vast majority of their customers. On information and belief, Stericycle only modified its practice at the end of 2012, when it settled with the New York State Attorney General – for full treble damages *for New York governmental customers only* – a *qui tam* case under the False Claims Act.

4.     Stericycle executives continue the practice after recognizing seven years ago that it was wrong because of the tremendous revenue generated from automated price increases. As in internal Stericycle e-mail states, "projected PI [Price Increase] revenue" was so big that it was separately tracked in "PI Impact analysis reports … sen[t] to Mark/Frank/Rich each month" – referring to Stericycle's three highest executives, CEO Mark Miller, CFO Frank Ten Brink, and COO Rich Kogler. The revenue stream from automated price increases was so

great that Stericycle only modified its practice when forced to by a multi-state government investigation.

5.    Stericycle's automated price increases were imposed automatically by the company's electronic billing software on most of Stericycle's "small-quantity" medical waste disposal customers.  They are a common course of conduct the legality of which will be adjudicated based on a common nucleus of operative facts from information in Defendant's control.  The only material difference among prospective class members' claims is the specific amount of their damages.  The operative customer contracts, standard form agreements written by Stericycle with no input from its customers, contained a choice-of-law clause applying a single state's laws to all disputes.  Adjudicating individually each claim of the hundreds of thousands of class members would overwhelm the court system.  This case is well-suited for treatment as a class action.

6.    On behalf of itself and all others similarly situated, Plaintiff seeks relief from Stericycle for injuries caused by this common practice, including:  (a) an order certifying the action to be maintained as a Class action and ordering Plaintiff and its counsel to represent the Class; (b) restitution; (c) compensatory damages; (d) punitive damages; (e) attorneys' fees; (f) costs of this suit; (g) pre- and post-judgment interest; and (h) such other and further relief as this Court may deem necessary or proper.

## II.    JURISDICTION AND VENUE

7.    This Court has subject matter jurisdiction over this class action

pursuant to 28 U.S.C. § 1332 as amended by the Class Action Fairness Act of 2005

because, on information and belief, the matter in controversy exceeds $5,000,000,

exclusive of interest and costs, and is a class action in which some members of the

Classes are citizens of states different than Defendant.  *See* 28 U.S.C. §

1332(d)(2)(A).  This Court also has personal jurisdiction over Defendants because

they are authorized to do business and in fact do business in this state and

Defendants have sufficient minimum contacts with this state, and/or otherwise

intentionally avail themselves of the markets in this state through the promotion,

marketing and sale of their products in this state, to render the exercise of

jurisdiction by this Court permissible under traditional notions of fair play and

substantial justice.

8.    Pursuant to 28 U.S.C. § 1391, venue is proper in the Northern District

of Illinois because Defendant resides in this District, Defendant is found in this

District, and/or Defendant is subject to personal jurisdiction in this District.

## III.    PARTIES

9.    Plaintiff LYNDON VETERINARY CLINIC, PLLC is a citizen of the

United States and a citizen of the state of New York.  In or about December 2008,

Lyndon Veterinary Clinic entered into a Steri-Safe Service Agreement with

- 4 -

Stericycle for Stericycle to provide medical waste disposal services for it. Lyndon Veterinary Clinic's agreement with Stericycle did not permit or provide for Stericycle to impose automated prices increases for the services Stericycle performed. Despite this fact and in violation of its contract, Stericycle charged Lyndon Veterinary Clinic automated price increases of 21.1% in 2009, 17.8% in 2010, and 25.4% in 2012. As a result, Lyndon Veterinary Clinic has been damaged.

10. Defendant STERICYCLE, INC. is a Delaware corporation with its principal corporate offices located in Lake Forest, Illinois. Defendant has been and still is engaged in the business of providing medical waste disposal services in the United States and abroad.

## IV. GENERAL ALLEGATIONS

A. **Stericycle and the Regulated Waste Disposal Business**

11. Stericycle has been in the regulated medical waste business since 1989. Regulated medical waste is generally any medical waste that can cause an infectious disease and includes single-use disposable items such as needles, syringes, gloves, and other medical supplies; cultures and stocks of infectious agents; blood and blood products; and regulated pharmaceutical waste, which consists of expired or recalled pharmaceuticals.

12.     The regulated medical waste services Stericycle provides include the
waste disposal service product provided to the majority of its customers called the
"Steri-Safe" program, medical waste disposal, a clinical services program, reusable
sharps disposal management services, pharmaceutical waste disposal, and
hazardous waste disposal.

13.     Stericycle serves approximately 541,000 customers worldwide.  It
divides its customers into two categories, large-quantity and small-quantity waste
generators.  Large-quantity waste generators include hospitals, blood banks, and
pharmaceutical manufacturers.  Small-quantity waste generators are such
businesses as outpatient medical clinics, medical and dental offices, long-term and
sub-acute care facilities, veterinary offices, and retail pharmacies.  Stericycle's
small-quantity waste generating customers also include federal and state
government agencies, municipalities, prisons, and jails.

14.     Almost all of Stericycle's customers are small-quantity customers.
Ninety-seven percent (524,500) of Stericycle's 541,000 customers worldwide in
2012 were small-quantity waste generators.

15.     A majority of Stericycle's revenues are from small-quantity
customers.  Stericycle had domestic revenues of $1.37 billion in 2012.  Sixty-three
percent, or $863 million, were from small-quantity customers.  And more of
Stericycle's profits come from these customers.  As stated in Stericycle's 2012 10-

- 6 -

K, Stericycle achieved "higher gross margins … with our small-quantity customers relative to our large-quantity customers."

16.     Stericycle uses both telemarketing and direct sales efforts to obtain new small-quantity customers.  In addition, Stericycle's waste disposal drivers actively solicit small-quantity customers.  Stericycle targets small-quantity customers as a growth area of its regulated waste business.  In contrast, Stericycle's marketing efforts for large-quantity customers are conducted by account executives, service specialists, and healthcare compliance executives.

17.     When Stericycle acquires a new small-quantity customer, whether from a cold call, client-initiated call, or through acquisition, Stericycle offers such customers Stericycle's standard form "Steri-Safe Service Agreement," which is a one to five year fixed-price agreement calling for specified, monthly or quarterly waste pick-ups.  A majority of small-quantity customers have the form "Steri-Safe" small-quantity customer contract.

18.     Customers for Stericycle's "Steri-Safe" service pay a predetermined subscription fee in advance for regulated waste collection and processing services. This service purports to satisfy the customer's obligations to dispose of medical waste in compliance with regulations of state and federal agencies, such as the Environmental Protection Agency and the Occupational Health and Safety Administration.  The standard form Steri-Safe Service Agreement contains an

- 7 -

automatic term renewal provision and does not expire absent affirmative action by the customer or Stericycle to terminate it.

B.     **Stericycle's Standard Form "Steri-Safe Service Agreement"**

19.     The Steri-Safe Service Agreement is a standard form contract drafted by Steri-Safe with no input from the customer.  The terms and conditions of the Steri-Safe Service Agreement, and all other written contracts offered by Stericycle, contain a choice-of-law provision that states that Illinois law governs any disputes between the parties to the contracts.

20.     The Steri-Safe Service Agreement consists of a cover sheet listing "Steri-Safe Program Benefits," fees, and a line for the customer's signature and a separate writing titled "Steri-Safe Terms and Conditions."  A copy of the Steri-Safe Service Agreement provided by Stericycle to Plaintiff is attached as Exhibit 1.

21.     As reflected on Exhibit 1, the Terms and Conditions provided by Stericycle to Plaintiff were a copy of a facsimile, in reduced type size, and completely illegible.  On information and belief, Stericycle's standard practice is to fax new customers terms and conditions to the Steri-Safe Service Agreement in similar illegible condition.

22.     In general, the Steri-Safe Terms and Conditions require Stericycle to collect, transport, treat, and dispose of regulated medical waste generated by the customer during the term of the agreement.

- 8 -

23.     The time period of the Steri-Safe Service Agreement is typically 36 months from the effective date.  However, the Terms and Conditions provide that the Service Agreement automatically renews for successive terms equal to the original term.  To prevent automatic renewal, the customer must give 60 days written notice of its desire to terminate the agreement, and the notice must be made during the six-month period prior to the renewal date.

24.     The fees the customer must pay for medical waste pickup and disposal are listed on the cover page of the Service Agreement.  Steri-Safe customers typically pay Stericycle a flat monthly or quarterly fee, the amount of which is expressly stated on the Service Agreement cover page.

25.     Stericycle offers a "select" and a "preferred" Steri-Safe service package.  Generally, the "select" service involves medical waste pickup and disposal and certain educational resources, while the "preferred" service adds an OSHA compliance training, evaluation, and guarantee component.

26.     Section 2(b) of the Terms and Conditions addresses increases in the flat fee during the term of the contract.  The operative language states:

> Stericycle reserves the right to adjust the contract price to account for operational changes it implements to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.

27.     Prior to October 2012, the standard form Steri-Safe contract did not contain other language addressing Stericycle's right to increase the flat fee provided for on the cover page of the Steri-Safe Service Agreement.

28.     The Terms and conditions expressly provide that the Steri-Safe Service Agreement automatically renews at the end of its term.  They state:

> Subject to the provisions below, the term ("Term") of this Agreement shall automatically renew for successive terms equal to the original Term (each an "Extension Term") unless either party has given sixty (6) days notice, in writing, during the six (6) month period prior to the renewal date of its desire to terminate this agreement. All Extension Terms shall be subject to the terms and conditions hereunder.

29.     In sum, prior to October 2012, the standard form Steri-Safe contract stated that Stericycle may increase its price only to account for "documented changes in law" and "to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation."  The Steri-Safe contract renews automatically, obligating customers to continue to use Stericycle's services continuously unless they provide 60 days notice of termination.  However, the form Steri-Safe contract does not provide for an increase in the price the customer must pay upon expiration and renewal of the contract, and Stericycle must continue to provide that service at the contract price.  Under the terms of the contract, Stericycle may not increase its disposal fee except in two circumstances – to

- 10 -

account for "operational changes" implemented "to comply with documented

changes in the law" or to "address cost escalation."

C.     **Stericycle's Unlawful, Unilateral "Automated Price Increase" Policy**

30.     During the relevant time period, Stericycle imposed an automated

price increase ("API") of 18% during a calendar year on all Steri-Safe contract

customers.  At times it imposed APIs annually and at times more frequently, often

every nine months.  Stericycle also imposed an API on small-quantity customers,

called transactional customers, that did not have a Steri-Safe Service Agreement

and instead paid for waste disposal services under a different Stericycle form

contract.  Stericycle's API policy was never disclosed to its customers or

authorized by Stericycle's form contracts.

31.     Stericycle has concealed its automated price increase scheme from its

customers and the public.  In a deposition dated August 26, 2009, in a suit for

improperly charging fuel and energy surcharges ultimately settled by Stericycle, its

Chief Operating Officer, Richard Kogler, was asked under oath what "automated

PI" meant, a term that the plaintiff's counsel was clearly unfamiliar with.

Mr. Kogler answered, "It means that it's automated within the system, so it's been

preset according to the customer's contract."  This answer was false, because

automated price increases were not mentioned in customers' contracts or charged

- 11 -

"according to" those contracts. This false response prevented Stericycle's API policy from being exposed during the deposition.

32.    Stericycle targeted small-quantity customers with its automated price increase policy (although some large-quantity customers paid APIs as well). Stericycle chose to target small-quantity customers because they were less sophisticated and had far smaller, if any, legal or accounting departments. Therefore, they were less likely to catch Stericycle's automatic 18% price increase. And if they did catch it, they were less equipped to challenge whether the price increase was prompted by an increase in Stericycle's actual costs.

33.    Stericycle used an electronic financial accounting and reporting system, named "Tower." Stericycle programmed the Tower financial reporting system to apply a periodic 18% price increase automatically to small-quantity customer accounts. Stericycle charged small-quantity customers price increases periodically, most frequently in 9 or 12 month intervals.

34.    Stericycle programmed Tower to default to an 18% API each year or nine months. While Stericycle's standard annual price increase for small-quantity customers was 18%, it charged customers other, varying price increases at different times during the year over the course of the relevant period.

35.    Tower contained multiple data fields, and a screen shot from the computerized Tower system could reflect a number of fields selected by the user.

- 12 -

One field available on Tower is the percentage amount of the last price increase charged any particular customer. All price increases that Stericycle imposed on small-quantity customers can be determined from the electronic records contained in Stericycle's Tower financial reporting system.

36.    In addition, to the last price increase amount, the fields populated with data on Tower include, for example, "Last Price Inc[rease] Date," "PI [Price Increase] exempt," "PI [Price Increase] Max Amt (%)," "PI [Price Increase] Expire Date," and "PI [Price Increase] Reason Code." A screen shot from the Tower financial reporting system appears as follows:



000700-00 598918 V1

37.     In the screen shot copied in the foregoing paragraph, an API of 18% is evidenced in the field in the middle of the screen named "Last Price Inc Amount."

38.     Stericycle did not internally correlate the annual API to its own costs, or to "documented changes in law."

39.     Stericycle's costs did not increase by 18% per year, or every nine months.  Yet Stericycle charged its small-quantity customers an 18% automated price increase each year.

40.     Stericycle's costs fluctuated from year-to-year.  Stericycle did not modify the amount of the automated price increase to reflect these fluctuations.

41.     Stericycle billed most small-quantity customers on a monthly basis.  It sent customers an invoice that listed as a line-item a description of the charge, which for most customers stated "Steri-Safe."  The invoice then listed a corresponding flat fee, usually monthly, for the Steri-Safe service.

42.     For example, Plaintiff's invoice dated November 1, 2009 is shown below:



43.    Plaintiff's invoice for the succeeding month, December 1, 2009, is shown below.



44.     Plaintiff's December 1, 2009 invoice reflects an API of 18% charged by Stericycle without an explanation to Plaintiff of any "documented changes in law" or escalation of Stericycle's costs.

45.     While the vast majority of its customers paid the API billed, not all agreed to pay the 18% API for which Stericycle invoiced them.  Stericycle's business organization included two departments intended to persuade small-quantity customers to pay as much of the 18% API as possible.

46.     Stericycle maintained a customer complaint department.  In the month that Stericycle implemented an API, this department routinely received a large number of complaints from Steri-Safe and other small-quantity customers.

47.     Stericycle employed various false reasons to justify the API to customers, especially in the customer complaint department. When customers objected to the API, Stericycle employees were directed by management to use false justifications in an attempt to get these customers to back down and acquiesce to these increases.

48.     Some customers refused to agree to Stericycle's API.  Stericycle maintained a "customer retention" department to address these clients.  Stericycle's practice was for the customer complaint department to refer to the customer retention department those customers who refused to agree to the API and

threatened to terminate their relationship with Stericycle. For these customers, the retention department was authorized to offer a discount on the API.

49. Stericycle had been aware since 2004, that several governmental authorities considered Stericycle's APIs to be an improper practice. These authorities include New York City, the State of New Jersey, and the State of Washington. Based upon these entities' objections, Stericycle formulated a written policy forbidding the use of the Steri-Safe agreement with its offending API for use within these jurisdictions. Certain large valued corporate clients, dubbed "the Nationals," were also exempted from APIs. Stericycle did not exempt its other customers, however – namely, Steri-Safe customers throughout the nation.

50. The same Steri-Safe contract template was used for both private and governmental customers. By 2006, Stericycle executives were aware that federal government customers objected to Stericycle's API policy. As a result, in September 2006, Stericycle Vice President Patrick Cott sent an e-mail to his subordinates directing them to stop charging APIs to federal government customers. While Stericycle understood that the terms of the Steri-Safe Service Agreement did not permit it to continue to charge APIs to the federal government, Stericycle continued to charge small-quantity private sector customers with APIs.

51. Mr. Cott's e-mail disclosed the reason that Stericycle continued its API policy despite recognizing that it was unlawful: it generated a substantial

revenue stream to Stericycle. Mr. Cott wrote to two subordinates: "Todd/Jerry –
please be advised of the potential impact to the PI Impact Analysis reports that
Courtenay sends to Mark/Frank/Rich each month, as these accounts will no longer
be in the mix for automated PIs and fuel charges, and ***thus you'll lose projected PI
revenue with this change***" (emphasis added).

D.    **The *Qui Tam* Suit**

52.    *Qui tam* Relator Jennifer Perez was hired by Stericycle as a temporary
employee in 2004, but soon moved into a full-time position in the collections
department. In that position, Perez began to see that Stericycle was overbilling its
governmental and non-governmental customers. In 2006, Perez was promoted to
the position of government specialist and was put in charge of preventing and
resolving disputes with the governmental accounts.

53.    Perez discovered that Stericycle was routinely billing all small-
quantity customers, including government customers, with annual 18% increases,
adding surcharges, and billing such customers in advance of any pickups. This
resulted in gross overcharges to these accounts.

54.    Perez's supervisors routinely admitted to her that they were aware that
Stericycle's API practices were improper with respect to the governmental
accounts, yet Stericycle continued these practices unabated.

55.     On April 28, 2008, Perez filed a *qui tam* complaint against Stericycle in the United States District Court for the Northern District of Illinois.  She filed a First amended *Qui Tam* Complaint on June 28, 2010.  Perez alleged that Stericycle had defrauded the United States, 14 states, and the District of Columbia by imposing an automatic periodic price increase in violation of its contracts with the governmental entities.

56.     Perez's complaint brought on behalf of the United States, 13 states, and the District of Columbia is still pending.

57.     On January 2, 2013, Stericycle settled the case initiated by Perez with the Attorney General of the State of New York.  In the Settlement Agreement, Stericycle admitted that "[d]uring the period January 1, 2003 through September 30, 2012, with respect to New York Government Customers, Stericycle presented invoices containing automatic price increases not authorized by contracts *viz.* automatic periodic rate increases (automated price increases or "APIs"), that resulted in overpayment for products and services."

58.     The Settlement Agreement between Stericycle and New York provides that Stericycle will reimburse the State for 100 percent of the charges resulting from automated price increases.   In addition, Stericycle agreed to pay treble damages to New York State as a result of the automated price increases.

59.     In the Settlement Agreement, Stericycle agreed that it would not in the future apply any APIs to New York Government customers.  Any APIs applied to and paid by New York Government customers after September 30, 2012 are to be credited back to customer accounts.

E.     **Plaintiffs' Experience With Stericycle's Automated Price Increases**

60.     Plaintiff entered into a Steri-Safe Service Agreement with Stericycle on May 21, 2009.  The Service Agreement provided that Plaintiff would pay Stericycle a flat monthly fee of $56.00.

61.     Stericycle invoiced Plaintiff for $56 per month until June 1, 2009.  On that date, Plaintiff's invoice reflected a 3.1% increase in its monthly fee.  Then again, on December 1, 2009, Stericycle attempted to charge Plaintiff an 18% increase in its monthly fee.

62.     Shortly after receiving the December 1, 2009 invoice, Plaintiff complained to Stericycle that the 18% increase violated his Steri-Safe Service Agreement.  Stericycle then rescinded the API, and provided Plaintiff with an "Addendum 'Price Increase' Term and Pricing" that specified that it would experience "a maximum … annual increase of 5%."

63.     On June 1, 2009, Plaintiff received an invoice from Stericycle that charged a 5% increase in its monthly fee.

64.     On March 1, 2011, Plaintiff received an invoice that charged it an 8.5% increase in its monthly fee.  Again five months later, on August 1, 2011, Stericycle imposed on Plaintiff an additional 7.5% price increase.  This was followed by a 1.8% price increase in December 2011.  In all in 2011, Stericycle charged Plaintiff with price increases totaling 17.8%.

65.     On May 1, 2012, Stericycle charged Plaintiff with another price increase, this one of 4.6%.  On December 1, 2012, Stericycle charged Plaintiff a price increase of 20.8%.  In all, Stericycle's 2012 price increases under Plaintiff's Steri-Safe Service Agreement amounted to 25.4%.

F.     **Stericycle's Practice of Charging Steri-Safe Customers Automated Price Increases Has Caused Damage To Plaintiff and the Class**

66.     According to Stericycle's 10-K, Stericycle had domestic revenues of $1.37 billion in 2012.  Most of these revenues – 63 percent, or $863 million – were from small-quantity customers.

67.     Further, more of Stericycle's profits come from small-quantity customers. As stated in Stericycle's 2012 10-K, Stericycle achieved "higher gross margins … with our small-quantity customers relative to our large-quantity customers."

68.     A majority of Stericycle's small-quantity customers have the standard form Steri-Safe Service Agreement.  For at least the past five years, most the

- 21 -

financial growth in the small-quantity customer segment of Stericycle's business has been because of increased Steri-Safe revenue.

69. During the relevant period, Stericycle imposed an automatic 18% annual price increase on all Steri-Safe contract customers, and on most small-quantity customers. In some cases, Stericycle ultimately was able to force the customer to pay only a portion of the 18% API, and in some years Stericycle charged customers price increases of more than 18%.

70. The APIs charged by Stericycle were not calculated using dollar amounts of the costs incurred by Stericycle, whether for changes in law, fuel, insurance, residue disposal, or other costs.

71. Column E of the table below shows, for the years 2006 through 2012, the revenue Stericycle unlawfully earned from small-quantity customers if it recouped from them the 18% API that was its standard policy and practice, based on Stericycle's annual form 10-K reports filed with the United States Securities and Exchange Commission. The exact amount of Stericycle's unlawful overcharges of its small-quantity customers can be easily derived from the data maintained on Stericycle's Tower electronic financial accounting and reporting system, which is in the exclusive control of Stericycle.

- 22 -

| A<br>Year | B<br>Total domestic revenue ($) | C<br>Total domestic revenue from small-quantity customers (%) | D<br>Total domestic revenue from small-quantity customer ($) | E<br>18% of D |
|---|---|---|---|---|
| 2012 | $1,370,000,000 | 63% | $863,100,000 | $155,358,000 |
| 2011 | 1,210,000,000 | 63% | 762,300,000 | 137,214,000 |
| 2010 | 1,080,000,000 | 63% | 680,200,000 | 122,472,000 |
| 2009 | 912,600,000 | 63% | 574,938,000 | 103,489,000 |
| 2008 | 830,800,000 | 63% | 523,404,000 | 94,212,000 |
| 2007 | 721,400,000 | 63% | 454,482,000 | 81,807,000 |
| 2006 | 616,400,000 | 63% | 388,322,000 | 69,900,000 |

## V.   CLASS ACTION ALLEGATIONS

72.    Plaintiff brings this action pursuant to Rule 23(b)(2) and (b)(3) of the

Federal Rules of Civil Procedure, on behalf of themselves and the members of the

following Class:

> All persons and entities that, pursuant to a contract with
> Stericycle, Inc., paid a flat fee for medical waste disposal
> services and whose fee was increased pursuant to
> Stericycle's automated price increase policy, excluding
> governmental entities whose claims are asserted in
> *United States ex rel. Perez v. Stericycle, Inc*.

73.    Excluded from the Class are Defendant, any entity in which

Defendant has a controlling interest or which has a controlling interest in

Defendant, and Defendant's legal representatives, predecessors, successors,

assigns, and employees.

- 23 -

74. The definition of the Class is unambiguous. Plaintiff is a member of the Class it seeks to represent. Members of the Class can be identified using Defendant's records of contracts and other information that is kept by Defendant in the usual course of business and/or in the control of Defendant. Records kept by Defendant identify the Class members who entered into a Steri-Safe Service Agreement or other small-quantity waste disposal contracts with Defendant. The members of the Class can be notified of the Class action through publication and direct mailings to address lists maintained in the usual course of business by Defendant.

75. Pursuant to Rule 23(a)(1), Class members are so numerous that their individual joinder is impracticable. As of December 31, 2012, Stericycle had over 500,000 small-quantity waste disposal customers, and a majority of these customers are Class members. The precise number of Class members is unknown to Plaintiff, but that number greatly exceeds the number to make joinder impossible.

76. Pursuant to Rule 23(a)(2) and (b)(3), except as to the amount of damages each member of the Class has by him/herself sustained, questions of fact and law are common to the Class, and common questions of law and fact predominate over the questions affecting only individual Class members. Some of the common legal and factual questions include:

- 24 -

(a)     Whether Defendant used standard form contracts with its small-quantity customers that charged a flat fee for regulated medical waste disposal;

(b)     Whether the claims of Plaintiff and the Class are governed by a choice-of-law provision in Defendant's standard form contracts, and whether pursuant to that provision Illinois law governs their claims;

(c)     Whether Defendant imposed an automated price increase on small-quantity waste disposal customers who entered into fee-based medical waste disposal contracts with Stericycle;

(d)     Whether Defendant's standard form contracts with its small-quantity medical waste disposal customers provided that Defendant could adjust the contract price only to account for operational changes it implemented to comply with documented changes in law, to cover increases in the cost of fuel, insurance, residue disposal, or to otherwise address cost escalation.

(e)     Whether Defendant's APIs were authorized by its standard form contracts;

(f)     Whether Defendant calculated its API using dollar amounts of the costs it incurred, whether for changes in law, fuel, insurance, residue disposal, or other costs;

(g)     Whether Defendant programmed the Tower financial accounting and reporting system to apply a periodic 18% price increase automatically to small-quantity medical waste disposal customer accounts.

(h)     Whether Defendant maintained the Tower financial accounting and reporting system to track APIs imposed on small-quantity waste disposal customers;

(i)     Whether Defendant instructed employees in its office responsible for responding to customer complaints to give customers pretextual reasons to justify APIs;

(j)     Whether Defendant disclosed its policy to impose APIs to its small-quantity medical waste disposal customers;

000700-00  598918 V1

(k)    Whether Defendant breached its contracts with Plaintiff and Class members;

(l)    Whether Defendant's conduct violated the Illinois Uniform Deceptive Trade Practices Act;

(m)    Whether Defendant was unjustly enriched by its practice of charging APIs;

(n)    Whether Defendant defrauded Plaintiff and members of the Class; and

(o)    The nature and extent of damages and other remedies to which the conduct of Defendant entitles Plaintiff and the Class members.

77.    Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff and the Class members.  A single, common policy to impose automated price increases not calculated based on costs incurred by Defendant is at issue in this case.  Individual questions, if any, pale by comparison to the numerous common questions that dominate.

78.    The injuries sustained by the Class members flow, in each instance, from a common nucleus of operative facts, Defendant's misconduct.  Each Class member was invoiced for an automated price increase that was not calculated using dollar amounts of the costs Defendant incurred and was not authorized by the Class member's contract.

79.    Pursuant to Rule 23(a)(3), Plaintiff's claims are typical of the claims of the other members of the Class.  Plaintiff, like other members of the Class, paid an automated price increase that was not calculated using dollar amounts of the costs Defendant incurred and was not authorized by its contract with Defendant.

- 26 -

Plaintiff was subject to, and was financially harmed by, a common policy and practice applied by Defendant to all Class members to charge automated price increases.

80.     Pursuant to Rule 23(a)(4) and (g)(1), Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is familiar with the basic facts that form the bases of the Class members' claims. Plaintiff's interests do not conflict with the interests of the other Class members that it seeks to represent. Plaintiff has retained counsel competent and experienced in class action litigation and intends to prosecute this action vigorously. Plaintiff's counsel has successfully prosecuted complex class actions, including consumer protection class actions. Plaintiff and Plaintiff's counsel will fairly and adequately protect the interests of the Class members.

81.     Pursuant to Rules 23(b)(3), a class action is superior to other available methods for the fair and efficient adjudication of this controversy because joinder of all class members is impracticable. The prosecution of separate actions by individual members of the Class would impose heavy burdens upon the courts and Defendant, and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. A class action would achieve substantial economies of time, effort and expense, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness.

82.     Individual litigation of the legal and factual issues raised by the conduct of Defendant would increase delay and expense to all parties and to the court system.  The class action device presents far fewer management difficulties and provides the benefits of a single, uniform adjudication, economies of scale and comprehensive supervision by a single court.  Given the similar nature of the claims of the members of the Class and the uniform application of Illinois law to the claims of Plaintiff and the members of the Class, the Class's claims will be effectively managed by the Court and the parties.

## VI.    CAUSES OF ACTION

### COUNT I

**Breach of Contract and
Breach of the Covenant of Good Faith and Fair Dealing**

83.     Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth above.

84.     Defendant formed agreements and entered into valid and enforceable contracts with Plaintiff and members of the Class including offer, acceptance, and consideration.  Defendant provided Plaintiff and members of the Class with a written standard form agreement drafted by Defendant, and Plaintiff and members of the Class accepted Defendant's offer and exchanged consideration by using Defendant's services and paying for them.

- 28 -

85.     Plaintiff and members of the Class have performed all, or substantially all, of the obligations imposed on them under their contracts with Defendant.

86.     Plaintiff and members of the Class paid a regulated medical waste disposal fee expressly set out in their agreements with Defendant as compensation for the services Defendant provided.

87.     Plaintiff and members of the Class fulfilled their contractual obligations to Defendant.

88.     Defendant breached its agreements with Plaintiff and members of the Class by imposing an automated increase that bore no relation to costs Defendant incurred on the fees they paid for medical waste disposal services.  Such automated increases were not provided for in the contracts or agreed to by Plaintiff and members of the Class.

89.     Good faith is an element of every contract in Illinois.  In Illinois, all contracts impose upon each party a duty of good faith and fair dealing.  Good faith and fair dealing are violated by a party's refusal to comply with contract terms despite knowledge that it was violating the contract and knowledge that refusal would result in serious damage.  Examples of bad faith include where a party interprets a contract in an unreasonable manner, and where it uses abusive or coercive practices designed to compel compromise on a claim.

- 29 -

90.     In this case, Defendant engaged in the following conduct that breached its duty of good faith and fair conduct:  (1) Defendant charged automated price increases undisclosed and unauthorized by its contract with Plaintiff and the Class; (2) Defendant used standard form contracts that it drafted with lengthy terms and conditions that were difficult to read and, often, transmitted to Class members in illegible form; (3) Defendant intentionally drafted loose language in order to create ambiguity over the basis and legal justification for automated price increases, knowing that its small-quantity customers were not legally sophisticated; (4) Defendant incorporated long-terms into its standard form contracts and incorporated automatic renewal and burdensome cancellation provisions; (5) Defendant concealed the true reasons for APIs from small-quantity customers and adopted an organizational structure designed to maximize payment of APIs from customers who complained; (6) a large portion of Defendant's profit and revenue were derived from illegal APIs; and (7) Defendant knew its practice of charging APIs was wrong and had been rejected by governmental authorities, but it continued to impose APIs on customers who were unaware of them.

91.     Since at least 2003, Stericycle has breached the covenant of good faith and fair dealing in its agreements with Plaintiff and members of the Class through its API policies and practices as alleged herein.

000700-00  598918 V1

92.     Defendant had an implied duty of good faith and fair dealing to Plaintiff and the Class.  Pursuant to that duty, Plaintiff and the Class had a reasonable and justified expectation that they would not be charged automated price increases.  They had a reasonable and justified expectation that the fee they paid Defendant would not increase automatically, unrelated to changes in Stericycle's costs for providing its services.  Defendant breached that duty when it charged Plaintiff and the Class APIs.

93.     As a direct and proximate result of Defendant's breaches of its agreements, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## COUNT II

### Violation of Illinois Consumer Fraud and
### Deceptive Business Practices Act, 815 ILCS § 505/1 et seq., and
### Illinois Uniform Deceptive Trade Practices Act,
### 815 ILCS§ 510/2

94.     Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth above.

95.     Defendant engaged in an unfair and deceptive act or practice by imposing automated price increases.  Defendant knew that its practice was not authorized by its contracts with Plaintiff and the Class, but it nevertheless used various forms of pressure and trickery to force small-quantity customers to pay as much of it as it could.

- 31 -

96.    Defendant concealed materials facts from Plaintiff and members of the Class.  Defendant's scheme included concealing that it used an automated price increase algorithm in its computer system to increase customers' fees, giving customers fabricated rationales for price increases, and offering discounts on APIs only to complaining customers and only if they threatened to cease using Defendant's services.  Defendant's practice offended public policy, was immoral, unethical, oppressive, and unscrupulous, and caused substantial injury to consumers.

97.    Buyers such as Plaintiff and members of the Class would have acted differently knowing that Defendant imposed APIs, and APIs concerned the type of information upon which a buyer would be expected to rely in making a decision whether to purchase.  Plaintiff and members of the Class would have wanted to know that Defendant imposed automated increases that bore no relation to its actual costs, and this information would have changed their and any reasonable customer's decision to use Defendant's services.  Defendant intended that Plaintiff and members of the Class would rely on its contract term that their regulated medical waste disposal fee would be fixed for the term of the contract and only increase for the reasons stated in the contract.  Plaintiff and members of the Class paid higher fees than they would have as a result of Defendant's APIs.

- 32 -

98.     Defendant's conduct is a violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510/2.  As a violation of Section 2 of the Illinois Uniform Deceptive Trade Practices Act, Defendant's conduct is a violation of Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS § 505/2.

99.     Defendant's unfair or deceptive act or practice occurred in the course of conduct involving trade or commerce.

100.    Defendant's consumer fraud proximately caused injury to Plaintiff and members of the Class.

101.    Pursuant to 815 ILCS § 505/10a, Plaintiff is entitled to actual damages, punitive damages, and reasonable attorneys' fees and costs, as well as any other relief the Court deems proper.

## COUNT III

### Unjust Enrichment

102.    Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth above.

103.    Defendant has unjustly retained a benefit to detriment of Plaintiff and members of the Class.  Defendant imposed an unlawful API on Plaintiff and the Class, and Plaintiff and the Class paid fees to Defendant inflated by Defendant's

- 33 -

API.  Defendant continues to possess money paid by Plaintiff and the Class to which it is not entitled.

104.   Defendant's retention of the benefit violates the fundamental principles of justice, equity and good conscience.  Defendant did not disclose to Plaintiff and the Class that it had a policy of charging APIs, and the terms of Defendant's contracts falsely conveyed that price increases were the result of operational changes implemented to comply with changes in law or specific increases in costs.  Defendant concealed that it used an automated price increase algorithm in its computer system to increase customers' fees, it gave customers fabricated rationales for price increases, and it offered discounts on APIs only to complaining customers – and only if they threatened to cease using Defendant's services.

105.   As a direct and proximate result of Defendant's practice of imposing APIs, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## COUNT IV

### Fraud

106.   Plaintiff realleges and incorporates by reference the preceding allegations as if fully set forth above.

- 34 -

107.    Defendant made a false statement of material fact to Plaintiff and the Class when its contracts stated the fee Defendant charged for medical waste disposal services.  In truth, that fee was to be increased by APIs not disclosed to Plaintiff or the Class.  Defendant knew that it would not charge the fee stated in its contracts, and instead that it would impose APIs on Plaintiff and the Class.

108.    Defendant intended that Plaintiff and the Class would agree to use Defendant's services based on the fee expressly stated in its contracts.  Defendant intended that its stated fee would induce Plaintiff  and the Class to act.  Plaintiff and the members of the Class relied on the fee as stated in their contracts with Defendant and expected that they would pay that fee, subject to the two limited conditions in which Defendant could increase the fee.  Instead, Defendant charged Plaintiff and the Class APIs, and the APIs damaged Plaintiff and the Class.

109.    Defendant concealed that it did not intend to, and did not, charge Plaintiff and the Class the fee stated in their contracts with Defendant, and instead intended to, and did, charge Plaintiff and the Class APIs.  Defendant concealed that it had a policy of charging APIs, and that the terms of Defendant's contracts falsely conveyed that price increases were the result of operational changes implemented to comply with changes in law or specific increases in costs.  Defendant concealed that it used an automated price increase algorithm in its computer system to

- 35 -

increase customers' fees. Defendant was under a duty to disclose these facts, and its failure to do so deceived Plaintiff and members of the Class.

110. As a direct and proximate result of Defendant's fraud, Plaintiff and the Class have suffered damages in an amount to be proven at trial.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff and Class members request that the Court enter an order or judgment against Defendant including the following:

A.     Declaring that this action may be maintained as a class action pursuant to Federal Rules of Civil Procedure, Rule 23, and for an order certifying this case as a class action and appointing Plaintiff as Class representative;

B.     Declaring that Defendant's practice of charging Plaintiff and the Class with automated price increases breached Defendant's contracts with Plaintiff and the Class and was wrongful and unfair;

C.     Declaring that, because of Defendant's breach of contract, Defendant's agreements with Plaintiff and the Class are void and unenforceable;

D.     Restitution of all automated price increases paid to Defendant by Plaintiff and the Class, in an amount to be determined at trial;

E.     Declaring that Defendant misappropriated and converted monies rightfully belonging to Plaintiff and the Class;

- 36 -

F.      Disgorgement of the ill-gotten gains derived by Defendant from its misconduct;

G.      Actual damages in an amount according to proof;

H.      Punitive damages;

I.      Compensatory damages caused by Defendant's unfair or deceptive practices; along with exemplary damages to Plaintiff and each Class member for each violation;

J.      A permanent injunction requiring Defendant to cease charging automated price increases or to modify its standard form contracts to inform all customers that it imposes, on a cycle to be determined at trial, an automated price increase not connected to operational changes implemented to comply with changes in law or specific increases in costs;

K.      Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

L.      An order awarding Plaintiff and the Class their attorney's fees and costs and expenses incurred in connection with this action; and

M.      Such other and further relief as the Court deems just and proper.

## VIII.  DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, of all issues so triable.

- 37 -

DATED: April 3, 2013                    HAGENS BERMAN SOBOL SHAPIRO LLP


                                        By:    /s/ Elizabeth A. Fegan
                                            Elizabeth A. Fegan
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        820 North Boulevard, Suite B
                                        Oak Park, IL 60301
                                        Telephone:   (708) 776-5600
                                        Facsimile:   (708) 776-5601
                                        E-mail: beth@hbsslaw.com

                                        Steve W. Berman
                                        Jeffrey T. Sprung
                                        HAGENS BERMAN SOBOL SHAPIRO LLP
                                        1918 Eighth Ave., Suite 3300
                                        Seattle, WA 98101
                                        Telephone:   (206) 623-7292
                                        Facsimile:   (206) 623-0594
                                        E-mail: steve@hbsslaw.com
                                        E-mail:  jeffs@hbsslaw.com

                                        *Attorneys for Plaintiff and the Proposed
                                        Class*

000700-00  598918 V1